**Elnora Spriggs WILLIAMS, Appellant,**

**v.**

**GENERAL MOTORS CORPORATION et al.,
Appellees.**

**No. 16128.**

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Oct. 4, 1973.

Rehearing Denied Nov. 29, 1973.

Jamail & Gano, Joseph D. Jamail, John Gano, Gus Kolius, Houston, for appellant.

Vinson, Elkins, Searls, Connally & Smith, B. Jeff Crane, Jr., Daniel A. Hyde, Houston (Ross L. Malone, James P. Melican, Jr., Detroit, Mich., of counsel), for appellee General Motors Corp.

The Kempers, Tom Kemper, Houston, for appellee Bob Robertson, Inc.

EVANS, Justice.

In this products liability case, plaintiff, Mrs. Elnora Spriggs Williams, recovered judgment for $1,000,000.00 against defendants, General Motors Corporation and Bob Robertson, Inc., upon jury finding of defective design in the steering coupling of Mrs. Williams' 1963 Chevrolet automobile. The trial court's judgment awarded Robertson full indemnification against General Motors.

Appellant, General Motors, first attacks on no evidence, insufficient evidence and

great weight points the submission of the special issues on defective design and causation. The basic issues submitted and answers given were as follows:

## Special Issue No. 1.

"Do you find from a preponderance of the evidence that the design of the upper steering coupling of the vehicle in question utilizing a combination of the size, shape or location of the lock ring; the size, shape or location of the clamp; and the size, shape or location of the sleeve constituted a defective design?

"By the term 'defective design' as used in the above special issue is meant an. upper steering coupling designed so that it would create an unreasonable risk of harm to the ordinary user when the product is used for the intended purpose.

"By the term 'unreasonable risk of harm' as used in the above and foregoing definition is meant that the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary user who purchased it with the ordinary knowledge common to the community as to its characteristics.

"To which the jury answered 'We do'.

## Special Issue No. 2.

"Do you find from a preponderance of the evidence that such defective design, if any, was a producing cause of the accident of April 12, 1969?

"To which the jury answered 'We do'."

General Motors argues that evidence which merely shows a steering system could have been designed which would have prevented the accident is not sufficient to establish liability on the part of the manufacturer; that a manufacturer is under no duty to design a product which eliminates all possibility of a product being rendered unsafe by intervening causes.

Mrs. Williams purchased her 1963 Chevrolet Impala new from Bob Robertson, Inc., approximately six years before the accident and it had been driven some 60,000 miles. She had been at a meeting in Memorial Park on that Saturday morning, was driving home via Interstate 10, the Katy Freeway, and was approaching the Pierce Elevated section of Interstate 45, the Gulf Freeway. It had been raining and the streets were wet. At a slight angle curve, Mrs. Williams lost control of her car and struck the guard rail, first with the left front fender of her automobile; the car then rotated in a counter clockwise direction so that the right front of the vehicle next struck the guard rail and then the car continued to spin so that the right rear of the automobile struck the guard rail. Mrs. Williams was apparently catapulted into the back seat and was rendered a quadriplegic by her injuries. Mrs. Williams' version of the accident was as follows:

"Q  Mrs. Williams, as you were driving along the freeway and as it came into the Gulf Freeway, did something happen to your automobile?

"A  No, I was driving down there and there is a section, a crossover that says 'To Dallas,' and on the Katy Freeway there was a teeny-weeny curve, you could hardly call it a curve because it was so little, but it is a curve, I suppose, and I wanted to make myself a little more comfortable so I sort of shifted my body a little bit. And then my wheel, I lost control, the wheel spinned around like a top, and then I was headed straight for the guard rail and I couldn't do anything about it. It happened so quick.

"Q  Did you have any steering at all in that car before this happened, right at the time this happened?

"Let me rephrase it. Did you have any warning?

"A  Before, no. I was just driving along perfect.

"Q   Did you have any warning at all, any noises, anything that occurred?

"A   Nothing.   And just turned, and I couldn't turn it back straight because I had lost control, my wheel was spinning around.

"Q   Did you try to turn it back?

"A   I tried to hard, but it wouldn't do it."

The wrecker driver who towed Mrs. Williams' automobile from the scene of the accident testified that when he checked the steering wheel before he hooked the automobile up to the wrecker, the steering wheel would "spin free" as though it had been disconnected and the wheels would not turn when the steering wheel was turned.

An automobile mechanic, Lavert LaRue, who testified for the plaintiff, inspected the automobile approximately one month following the accident while it was situated at the wrecking lot.   Mr. LaRue testified that the coupling which connects the upper steering shaft to the intermediate steering shaft had separated and that the steering wheel was no longer attached through the shaft to the steering gear.   Mr. LaRue attributed the separation to a defectively designed coupling unit.   A drawing of the steering coupling assembly is set forth on pages 933–934 of this opinion.   Exhibit A shows the coupling assembled and Exhibit B is a drawing of the disassembled parts with the thrust clamp, sleeve and lock ring circled.

Apparently an upward pull on the steering wheel by the driver will disengage the upper steering column from the metal coupling if the thrust clamp is loose on the shaft and if the lock ring is not in place in the coupling.   On this point LaRue testified:

EXHIBIT A

UPPER PORTION OF 1963 CHEVROLET STEERING SHAFT

SPRING RETAINER CLAMP (THRUST CLAMP)

SPRING CLIP

RECTANGULAR BEARING BLOCK
(METAL SHOES)

GARTER SPRING

RUBBER BOOT

STEEL WASHER

1 INCH SLEEVE

RETAINER RING (LOCK RING)

EXHIBIT B

EXPLODED VIEW OF UPPER PORTION OF 1963 CHEVROLET STEERING SHAFT

"Q Well, now, let me ask you this: What is it there that you found that would in your opinion permit this coupling to separate or come apart or fail before the impact occurred? What did you find there that permits this?

"A Well, there was two things that I found. The lock ring that goes in the upper part of the upper metal coupling was missing. It wasn't even there and didn't look like it had been there for a long period of time, and also, the little thrust clamp that is located at the lower end of the upper steering shaft just above the metal coupling was loose to where I could turn it on the shaft and it was pushed all of the way down against the boot and the pin at the lower end of the upper steering shaft.

"Q Now, these two conditions that you found, that is, the lock ring not being in there, and I take it from what you say your visual inspection of the coupling and the slot where the lock ring is supposed to go—I would like for you to describe that to me again, this place that the lock ring goes. How did it look to you when you saw it?

"A Well, it looked normal, other than the lock ring was missing, and there was dirt that had collected in the eyelets and all over the metal coupling like the little lock ring had never been in place, or had been out of place for a long time, long enough for dirt and grease to collect in these little slots or cut in the sides at the top of the metal coupling.

"Q Did these little slots, were they completely full of grease and oil and dirt?

"A Yes, sir. They were.

"Q Would it take, based on your experience and based on your experience as an automobile mechanic, a long period of regular automobile use to accumulate that much residue in those slots?

"A Yes, sir, I believe it would.

"Q Were there any marks about that that would indicate that it had been disturbed, the grease and dirt had been disturbed in this are?

"A   No, sir, there wasn't.

"Q   Let's turn for a minute from the fact that the lock ring was not there, and let me ask you what is the purpose of this lock ring? Why is it supposed to be there?

"A   The purpose of it is to hold the boot down and the top of the metal coupling in place. It also acts as a safety factor to keep the coupling together and to keep from pulling it apart.

"Q   As long as this lock ring is in place, is it possible for the driver of the car to dislodge this coupling?

"A   I don't believe you could pull it hard enough to dislodge it.

"Q   All right. Now, let's turn for a minute to the clamp. You have described this as a small clamp. What do you mean by that?

"A   Well, it is a small clamp that goes around a three-quarter-inch shaft that has a little quarter-inch standard thread bolt through it, and to me that is a small clamp.

"Q   Now, what is its purpose" Why is it there?

"A   Its purpose is to hold the steering wheel down and to push the little spring up at the bottom to keep the steering wheel from being pulled up and down. It preloads the bearings at the upper and lower end of the mast jacket and keeps the steering wheel from being pulled up. That is its only purpose.

"Q   Now, what is the combination result as far as the integrity of the steering system is concerned when the clamp is loose and the lock ring is missing?

"A   You could still steer the car if you did not pull up on the steering wheel, but if you pulled up on the wheel, you would separate the upper shaft from the lower shaft and you would lose all steering ability of the car.

"Q   Well, would this require a great deal of physical effort?

"A   No, sir. It would not.

"Q   Would it occur readily easily?

"A   Yes, sir, it would occur easily. If you pulled up on the wheel, it will separate easily.

"Q   And the integrity of the coupling designed and built is maintained by the clamp and the lock ring?

"A   Yes, sir.

"Q   And when you examined the Williams car, tell us once more what conditions you found as relates to the clamp and the lock ring?

"A   The clamp was loose on the shaft, loose enough so that I could turn it with my fingers. The lock ring out of the upper steering metal column was missing."

As to the lock ring itself LaRue testified:

"Q   Is that the lock ring that you were speaking of before?

"A   Yes, sir, this is the lock ring that was missing out of Mrs. Williams' car. This was not—it wasn't there.

"Q   Is it a regular or standard part of this coupling assembly?

"A   Yes, sir, it is.

"Q   Is it difficult to remove?

"A   No, sir, it's very easily removed. I think it's too easily removed.

"Q   No, don't say anything like that.

Let me ask you this. What do you mean it's easily removed?

"A   Well, you can flip it out real easy. You can remove it with a piece of twine string."

As to the effect of the lock ring and the thrust clamp on the integrity of the steering assembly, Mr. LaRue further testified:

"Q   And it is your testimony that with this lock ring, you demonstrated how this can just be pulled apart?

"A  Yes, sir.  From the lower end it will just come apart.

"Q  Right.  Now, what else is there? We have talked about a clamp in addition to the lock ring which retains the assembly in its proper position.

"A  This is the thrust clamp.

"Q  I would like for you to point that out for the jury so we will be sure we all understand it.

"A  This is the little thrust clamp that locks around the upper steering shaft, and it also has a little spring just above it that holds the up and down of this steering wheel so you can't pull it up, and that's all. It holds it until you get down to this pin or boot.

"Q  Now, is it your testimony that this clamp on the Williams automobile when you examined it on the date that you did examine it was loose or tight?

"A  It was loose.  I could turn it on the shaft with my fingers.

"Q  Did it occupy on the steering shaft the position that the clamp on Plaintiff's Exhibit No. 2 occupies, or was it in some different position?

"A  Oh, it was in a different position. It had slid all of the way down.  This was all of the way down and this clamp was at the extreme lower end pressing against this boot.

"Q  Now, is there anything, once the spring clip or this locking clip is dislodged, or not in place, is there anything other than this little clamp that keeps this wheel from sliding up and disengaging this coupling so as to deprive the operator of power steering motion of the car?

"A  No, sir.  There is nothing else that keeps the shaft from coming up.

There was testimony elicited both from Mr. LaRue and from Mr. Robert James Smith, an engineer for General Motors, that in Chevrolet models 1958 through 1960 the sleeve at the lower end of the upper steering shaft was 2⅝ths inches in length and that in re-designing the steering system in later model automobiles, General Motors had shortened the length of the sleeve to 1″ or 1⅛th inches in length. Both witnesses testified that the longer sleeve would have kept the steering coupling from disengaging even if the lock ring were not in place and the thrust clamp were loose.  There was also testimony from both witnesses that the thrust clamp on earlier model automobiles was much stronger than the clamp on the 1963 model and could therefore be affixed much more tightly to the steering shaft.  Mr. LaRue testified that in his opinion the 1963 model thrust clamp was too small and that the bolt which went through it was too small, and that the larger clamp on the earlier models would be a much stronger and safer design because it could be tightened with much greater torque.

The witness LaRue testified that in his opinion the design of the lock ring was inadequate and unsafe because it could be removed too easily; that it could be accidentally removed since it was on the outside of the metal coupling and therefore exposed.  He said the steel sleeve design was unsafe because it had been shortened to the extent that it would not prevent separation if the lock ring came out and the thrust clamp was loosened.

Both LaRue and Smith testified they did not consider 60,000 miles an abnormal life span of an automobile and that they did not consider it unusual for an automobile to be driven 60,000 miles in six years.  Mr. Smith testified that a lock ring could have been designed which was not so easily removed and that it had been more difficult to remove on earlier models.

◼  We are of the opinion that the evidence supports the jury's findings as to de-

fective design and causation. In response to Special Issue No. 1 the jury might well have decided from the evidence presented that the 1963 coupling with its shorter sleeve, weaker thrust clamp and exposed lock ring constituted an unreasonably dangerous design mechanism, one which created an unreasonable risk of harm to the automobile operator. On this matter General Motors' own engineer, Mr. Smith, testified:

"Q If there was a disruption in the integrity of the steering assembly so that the driver had no control, no steering control at all, you would say certainly that the vehicle was not safe for its intended use?

"A At that point in time?

"Q Yes.

"A Yes, sir.

"Q And of course, it would be unreasonably dangerous, would it not?

"A It is unreasonably dangerous to drive a vehicle when you do not have steering control, yes, sir.

"Q And we are faced with the situation in the 1963 Chevrolets such as was sold to Mrs. Williams, that the omission or removal of the lock ring, a loose spring retaining clamp, and some upper pressure on the steering wheel can result in a complete loss of steering control, are we not, sir?

"A If you can pull it up far enough towards you, yes, about an inch and three-quarters is about what it takes."

Plaintiff's witness, Mr. LaRue, said on this point:

"Q Mr. LaRue, in the event that the lock ring was not in place and the clamp had become loose, do you have an opinion as to whether or not that vehicle would be an unusually dangerous thing?

"A Yes, sir, I do have an opinion.

"Q What is that opinion, Mr. LaRue?

"A It would be unusually dangerous to drive a vehicle like that because with a pull up on the steering wheel the steering mechanism would become disconnected.

"Q And when it disconnects, what capacity does the driver have to control the automobile?

"A None, It would be impossible to steer the car."

To similar effect, the "make ready" man at Robertson Chevrolet, Mr. Cerda, testified:

"Q And if the lock ring is missing and the clamp, the bolt and the clamp below is loose, will that cause or allow the coupling to separate by pulling the steering wheel toward the driver?

"A Yes, sir."

There is no suggestion in the record that an excessive or unusual amount of pulling force would have to be exerted on the steering wheel to cause the coupling in this system to separate (assuming, of course, the thrust clamp was loose and the ring lock was missing) and no contention is made that Mrs. Williams contributed to the failure of the system by any unreasonable pulling action on the steering wheel.

■ The jury was at liberty to infer from the evidence that mechanical failures in the coupling system, such as a loosening of the thrust clamp and an accidental extraction of the ring lock might reasonably be anticipated over years of normal operation. Mechanical failures of this type are not due to any material alteration in the automobile system, as contended by General Motors, but are of a nature as to result from ordinary wear and usage. Garcia v. Sky Climber, Inc., 470 S.W. 261 (Tex.Civ. App.—Houston, 1971, writ ref'd n. r. e.):

The steering assembly from a 1963 Chevrolet Impala was received in evidence

as an exhibit and each member of the jury had the opportunity to personally inspect the steering assembly and its component parts. The jury, therefore, not only had the benefit of the witnesses' explanations but could determine for themselves the function of the thrust clamp, sleeve and ring lock in maintaining the integrity of the steering system. Garcia v. Sky Climber, Inc., supra; See also Ford Motor Co. v. Dees, 223 So.2d 638, Miss.Sup.Ct.1969.

■ It was not essential to plaintiff's theory of recovery, as General Motors contends, that she obtain findings that the defective conditions (i. e., the loose thrust clamp, short sleeve and missing ring lock) were present at the time of the accident. The form of issues submitted in this case previously found approval in Ford Motor Company v. Russell & Smith Ford Co., 474 S.W.2d 549 (Tex.Civ.App.—Houston, 14th, 1971, n. w. h.), and the jury's finding that the defective design was the producing cause of the accident was, by necessary implication, a finding that the conditions were present at the time of the accident. Upon the circumstances of this case, we hold the judgment is supported by the jury's findings of defective design and producing cause. Pizza Inn v. Tiffany, 454 S.W.2d 420 (Tex.Civ.App.—Waco, 1970, n. w. h.); See also 51 A.L.R.3rd 8; Williams v. Ford Motor Co., 411 S.W.2d 443, Missouri Ct. of App. (1967). Any separate submission of an issue on present conditions would, in our opinion, have been superfluous.

■ On the issue of causation Mrs. Williams testified she had no warning, no prior indication of any difficulty in the steering system. Mrs. Williams said the first she knew was that the steering wheel spun around and she lost control. General Motors' engineer, Mr. Smith, testified that in his opinion the impact of the collision caused the steering coupling to separate; Mr. LaRue gave his contrary opinion that the coupling had separated before the impact. Mr. LaRue explained his reasoning:

"A  My opinion was that the coupling separated before the point of impact. Had it been intact at the point of impact, it would have stayed together, not separated, because, the force of the body coming, still going forward and the bumper and the frame hitting something in the front of the car would cause the lower shaft and the upper shaft to try to come together and not to separate.

"Q  In other words, to shorten instead of to lengthen?

"A  Yes, sir.  That's true."

Mr. LaRue further testified that he examined the steering assembly after the accident; he did not find any damage to the coupling itself. The witness for General Motors, Mr. Smith, conceded that if the steering coupling had been together at time of impact some damage would have been evident:

"Q  In the event that the coupling had been together at the time of impact, and the impact caused the steering assembly to shorten, you would expect that an examination would reveal some damage to the coupling itself, would you not?

"A  I would expect it to reveal impact marks illustrating the fact that it had been, yes, sir, compressed.

"Q  And if the impact marks were not there on examination after the impact, then it would indicate to you, would it not, Mr. Smith, that the coupling was not together at the time of impact?

"A  Yes."

The jury was at liberty to resolve the issues in favor of plaintiff's version, and we do not find the jury's findings to be against the great weight and preponderance of the evidence. We further find that the judgment is supported by the jury findings. General Motors' points of error 1 through 6 are overruled.

For the same reasons as are stated above with respect to General Motors' points we

overrule Robertson's cross-points of error nos. 1 through 4.

■■ General Motors contends that the testimony of the witness LaRue should have been excluded in its motion to strike because Mr. LaRue did not possess qualifications necessary to express an opinion on the issue of design defects. The evidence showed Mr. LaRue had worked on automobiles for a period of 35 years and that he was familiar with the design of various Chevrolet model steering systems similar to that in the automobile owned by Mrs. Williams. LaRue testified he had personally examined the steering assembly on Mrs. Williams' wrecked automobile. In our opinion the trial court was justified in finding Mr. LaRue qualified to give his expert opinion as to design defects in that mechanism. Ford Motor Co. v. Dees, supra; Texas Power & Light Co. v. Bird, 165 S.W. 8 (Tex.Civ.App.—Austin 1914, writ ref.). General Motors' motion to strike the testimony of Mr. LaRue was first made after the witness had been excused and plaintiffs had rested their case. This motion was generally levelled at the entire testimony of the witness and did not specifically point out the testimony which it contends was objectionable. Some of LaRue's testimony was clearly admissible and the trial court did not abuse its discretion in overruling General Motors' motion to strike Mr. LaRue's testimony. Appellant, General Motors', points 8 and 9 are overruled. Bolstad v. Egleson, 326 S.W.2d 506 (Tex.Civ.App.—Houston 1959, writ ref., n. r. e.); Guadalupe Valley Electric Co-op v. Towns, 397 S.W.2d 496 (Tex. Civ.App.—Corpus Christi 1965, n. w. h.). For the same reason, we overrule Robertson's cross-point of error no. 5.

■ Mrs. Williams' fourth amended original petition, filed less than sixty days prior to trial, alleged and prayed for damages in the stated sum of $1,000,000.00, and additionally prayed for interest, costs and general relief. Her trial amendment seeking to increase her plea for damages to the sum of $1,750,000.00 was tendered after all parties had rested. The jury, upon the evidence presented, found damages which in cumulative effect totaled $1,555,678.00. Mrs. Williams, in four points of error, contends the trial court abused its discretion in refusing leave to file her trial amendment and erred in not rendering judgment for the aforementioned sum of $1,555,678.00.

There is no showing, either in the statement of facts or by bill of exception, of the circumstances attending the presentation of Mrs. Williams' trial amendment. Upon the record before us, we must presume that the trial court acted upon proper grounds in denying leave to file. Herrin Transportation Co. v. Parker, 425 S.W.2d 876 (Tex.Civ.App.—Houston, 1st, 1968, writ ref., n. r. e.); Rule 66, Texas Rules Civil Procedure; First National Life Ins. Co. v. Herring, 318 S.W.2d 119 (Tex.Civ. App.—Waco 1958, n. w. h.). There was no trial by consent or waiver merely because the cumulative evidence on damages mathematically would compute to a sum greater than that sought by plaintiff in her amended petition. Denton County Co-op v. Burkholder, 354 S.W.2d 639 (Tex.Civ.App. —Ft. Worth 1962, writ ref., n. r. e.); Kleiner v. Eubank, 358 S.W.2d 902 (Tex. Civ.App.—Austin 1962, writ ref., n. r. e.). Until the time Mrs. Williams tendered her trial amendment and sought to further increase her claim for damages, the defendants were entitled to rely upon the maximum claim specified in her amended petition. Socony-Vacuum Co. v. Aderhold, 150 Tex. 292, 240 S.W.2d 751 (1951); Denman v. Stuart, 142 Tex. 129, 176 S.W.2d 730 (1944); Westinghouse Electric Corp. v. Pierce, 271 S.W.2d 422, 424 (Tex.Sup. 1954); Denton Electric Co-op v. Burkholder, supra. We further note that Mrs. Williams elected not to file motion for new trial. We do not believe the assigned error was preserved since it was not brought to the trial court's attention by motion for new trial. Rule 324, T.R.C.P.; Milam v.

**940**

Cooper Co., Inc., 258 S.W.2d 953 (Tex. Civ.App.—Waco 1953, writ ref., n. r. e.); First National Life Ins. Co. v. Herring, supra. Mrs. Williams' points one through four are overruled.

 Appellee Robertson, in his sixth cross-point, contends the trial court erred in admitting testimony of Dr. Thomas Mayer, on the issues of projected wage loss and future medical costs because such testimony was based upon statistical data not in evidence and was too speculative to support the verdict.

Dr. Mayer, holder of a Ph.D. in Economics and a professor of Economics at the University of Houston, testified as an expert witness for Mrs. Williams. He gave his opinion as her projected wage loss, discounted to current date, which he said was based upon information supplied him as to her age, educational background, employment and wages at the time of the accident. He testified that he also correlated these factors with official salary schedules of the Houston Independent School District and with data of the Bureau of Labor Statistics reflecting inflationary trends in the cost of living. Dr. Mayer also gave his opinion as to the cost of future medical services required by Mrs. Williams and again said he used data obtained from the Bureau of Labor Statistics as part of the basis for his opinion.

The record clearly reflects that Dr. Mayer was testifying as an expert witness and that his opinion was based only partially upon the statistical information obtained from the Houston Independent School District and the Bureau of Labor Statistics. There was no claim of surprise or that the data was not equally available to the parties. The trial court expressly instructed that Dr. Mayer was merely giving his opinion on these matters and that the jury was not required to accept his opinion as a fact. We believe the admission of this testimony upon such limiting instruction was proper. Lewis v. South-

more Savings Association, 480 S.W.2d 180 (Tex.Sup.1972). Robertson's cross-point no. 6 is overruled.

The judgment of the trial court is affirmed.