**Opinion issued June 28, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00509-CV

————————————

**VICTORIA MATA, INDIVIDUALLY AND ON BEHALF OF S.H., THE ESTATE OF SEAN HANNER AND INTERVENORS BETH KING AND JEFF HANNER, Appellants**

**V.**

**COASTAL AGRICULTURAL SUPPLY, INC. AND BRIAN EVERETT HERALD, Appellees**

---

**On Appeal from the 129th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-37366**

---

## MEMORANDUM OPINION

Appellants, Victoria Mata, Individually and on Behalf of S.H., The Estate of

Sean Hanner and Intervenors Beth King and Jeffrey Hanner, appeal the trial court's

take-nothing judgment rendered in favor of appellees, Brian Herald and Coastal Agricultural Supply, Inc.  In three issues on appeal, appellants argue that (1) legally and factually insufficient evidence supports the verdict and (2) the trial court erred in failing to strike the testimony of appellees' expert.

We affirm.

## Background

On the early, foggy morning of January 27, 2014, Coastal's employee, Herald, drove his 18-wheeler to a feed store for his first delivery of the day.  Because the owner of the feed store did not want deliveries before 7 a.m., Herald waited at a gas station parking lot at the intersection of FM 1960 and County Road 686.  Around 7 a.m., Herald exited the gas station and stopped at a stop-sign on County Road 686 before attempting a left-hand-turn and driving east on FM 1960.  Because of the dense fog, Herald had limited visibility.  Herald looked both ways, listened for traffic through his open window, and entered the intersection to make his turn onto FM 1960.  Before Herald could complete the turn, Sean Hanner, who was riding a motorcycle westbound on FM 1960, collided with Herald's trailer.  Herald stopped the truck and realized that a motorcycle had hit the trailer.  Hanner died at the scene of the accident.

Appellants filed suit against Herald and Coastal for negligence and gross negligence.  At the conclusion of trial, the jury was asked whether the negligence,

if any, of Herald or Hanner caused the occurrence in question. The jury answered "no" to Herald and "yes" to Hanner. The trial court then rendered a take-nothing judgment in favor of appellees. Appellants filed a motion for judgment notwithstanding the verdict and a motion for new trial. The trial court denied both motions and this appeal followed.

**Legal and Factual Sufficiency**

In their first and second issues on appeal, appellants argue that the evidence is legally and factually insufficient to support the jury's no-liability finding for Herald.

**A.     Standard of Review**

When a party attacks the legal sufficiency of an adverse finding on an issue for which he bears the burden of proof, the party must demonstrate that the evidence establishes, as a matter of law, all vital facts in support of the issue. *See Dow Chem. Co v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). In reviewing a "matter of law" challenge, we first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id*. If there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id*. We may only sustain a legal-sufficiency challenge if the contrary position is conclusively established. *Id*.

When a party attacks the factual sufficiency of an adverse finding on an issue for which he has the burden of proof, the party must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *See Dow Chem.*, 46 S.W.3d at 242. We consider and weigh all of the evidence in a factual-sufficiency review, not just the evidence in support of the jury's findings. *Id.* We may only set aside a verdict for factually insufficient evidence if the jury's findings are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Therefore, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence also would support a different result. *Id.* When presented with conflicting evidence, a jury may believe one witness and disbelieve others, and it also may resolve any inconsistencies in the testimony of any witness. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). If we determine that the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict; we need not do so when affirming a jury's verdict. *Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex. 2006) (per curiam).

To prevail on their negligence cause of action against Herald, appellants had to establish the existence of a duty, a breach of that duty, and damages proximately caused by the breach. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). To establish breach of duty, the plaintiff must show either that the defendant did something an ordinarily prudent person exercising ordinary care would not have done under the particular circumstances or that the defendant failed to do something that an ordinarily prudent person would have done in the exercise of ordinary care. *Caldwell v. Curioni*, 125 S.W.3d 784, 793 (Tex. App.—Dallas 2004, pet. denied); *Lincoln Prop. Co. v. DeShazo*, 4 S.W.3d 55, 61 (Tex. App.—Fort Worth 1999, pet. denied).

## B.     Analysis

The court's charge asked the jury, "Did the negligence, if any, of those named below proximately cause the occurrence in question?"  The charge further provided,

> "Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

> "Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

> "Proximate cause" means a cause that was a substantial factor in bringing about an occurrence, and without which cause such

5

occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence. An occurrence may be an "unavoidable accident," that is, an event not proximately caused by the negligence of any party to the occurrence.

The jury answered "no" as to Herald, and "yes" as to Hanner.

At trial, Herald testified that when he arrived at the gas station, the fog was dense and everybody was driving blind. About an hour later, Herald proceeded to leave the gas station and stopped at the stop sign at the intersection of FM 1960 and County Road 686. Before making a left-hand turn into the intersection, he looked left, looked right, and looked left again but did not see any headlights. He also had his driver's window down and did not hear or see anything. He then decided based on his years of driving that he could safely make the turn. He further testified that "I didn't do anything wrong. I pulled out. I gave myself plenty of room in my best judgment." Herald testified that he had his headlights on and that when the headlights are turned on, all of the other lights on the truck switch on. The truck also had reflective tape going down both sides of the trailer.

Herald's counsel asked if Herald had visibility of 420 feet, representing the distance from the back of the truck to the gas station, to which Herald responded, "yes." Herald agreed that if he saw headlights, he would have been able to see further than 420 feet.

Although Herald previously testified at his deposition that he had only 100 feet of visibility, he clarified at trial that he did not have a tape measure or a landmark to tell exactly how far he could see. Herald testified that it would take him 5 to 6 seconds to get through the intersection from a stopped position, and he needed enough space to accelerate on the roadway so that the drivers with the right-of-way on FM 1960 did not have to "jam" on their brakes to make sure that they did not strike the truck. Herald admitted that if a driver cannot see, he must wait until he can see and that if the driver enters the intersection anyway and harm is caused, that driver is responsible for the harm.

When asked if he could see across the street when he started to enter the intersection, Herald agreed that he could "see a little bit across the street" but he disagreed with counsel's characterization of visibility of a hundred feet. Despite appellants' counsel repeatedly saying that Herald only had 100 feet of visibility, Herald continued to correct him that it was more than 100 feet. Herald explained that when he originally testified to having 100 feet, he did not have a tape measure, a landmark, that it was just an estimated guess, and he did not get out to see how much visibility he had. He explained that he had some visibility and that when he made the judgment, "I knew I had enough to make it; and that's when I went. I wouldn't have pulled out if I didn't have it." Appellants' counsel showed the jury Herald's previous deposition in which Herald testified that he did not have much

7

visibility at all, that he was driving blind and that he was gambling that there were no other vehicles 101 feet away.

David Scott Britton, a beneficial owner of Coastal, testified that "from all the photographs I've seen, personal experience, and his experience, I think [Herald] turned left feeling he could clear the intersection and proceed safely." Britton also believed that Harold's actions were done in good faith and that he could do it safely. Britton answered affirmatively to the question of whether the distance between the back of the trailer and the gas station was a sufficient distance of visibility to safely pull out from the stop sign. Britton also answered that he would have made the same turn based on pictures he saw that were taken by the police after the accident.

Kayla Williams, appearing by deposition, testified that, on March 27, she was driving west on FM 1960, following an SUV in foggy conditions. She recalled seeing a motorcycle behind her which eventually moved into the left lane and passed her and the SUV. She estimated that at the time the motorcycle passed her, she was driving 40 miles per hour. Williams then passed the SUV to follow the motorcycle because she "didn't want to be the one to run him over if he had fallen off because of some other obstacle further on down the road." She followed the motorcycle for at least a few minutes, but it would pull away and she would

have to accelerate to see him. She testified that, while following the motorcycle, her speed increased to 55 miles per hour.

After the motorcycle disappeared, she then heard the screeching of an 18-wheeler's brakes. As she slowed down, she began to see the "vision of the back end of the trailer." She avoided the 18-wheeler and pulled into the gas station at the intersection of FM 1960 and County Road 686. She disagreed that she was traveling at a prudent speed based on the conditions while she was following the motorcycle and instead described it as an "unsafe speed" because of the patchy fog. Williams agreed that she was not looking at the speedometer and so her estimates were merely that. She testified that had she not heard the screeching of brakes, she might have been involved in the accident. She eventually met with police and told them that she did not think that the accident could have been avoided.

Justin Green, appearing by deposition, testified that as he was driving east on FM 1960 in heavy fog, an 18-wheeler appeared and he had to "slam" on his brakes to avoid it. Green characterized it as a close call, but he eventually stopped short of hitting the 18-wheeler. After parking his car, Green checked on the motorcycle driver and did not detect any movement. Green testified that when he was standing at the back of the truck, he could see the gas station, even though it got foggier after the accident. He agreed that it was a mistake, but he felt like it

was an accident. He testified that he was driving between 45 and 50 miles per hour and recalled thinking that "it was so bad you just could not see that well that day." He did not feel comfortable going over the speed that he was driving, but he also explained that he was not comfortable with the speed he was driving. Green said that "I guess you could say everybody was driving a little blind that day."

Agent Christopher Cash of the Texas Department of Public Safety, appearing by deposition, testified that he arrived 50 minutes after the accident and described the conditions as impaired visibility due to very dense fog. Agent Cash testified that the motorcycle did not produce any skid marks and "the fact that [Hanner] did not have a reaction to the trailer leads me to believe that [Hanner] didn't have a chance to react to the trailer." Agent Cash agreed that Herald moved into a roadway where he did not have the right of way and where it was impossible to see the traffic. He agreed it was not prudent to do that, and the chance Herald took cost Hanner his life.

Sergeant Carr of the Dayton Police Department, appearing by deposition, agreed that Herald should not have entered the roadway until he had an assured clear distance. He also agreed that it was always better to wait until a driver can see before getting into the roadway. He testified that he was the first officer to arrive approximately seven minutes after getting dispatched at 7:02 a.m., it was "extremely foggy," and he thought there was 30 to 40 feet of visibility. Sergeant

Carr said that, when he was standing at the trailer, he could barely see the gas station because the fog was so heavy.

Appellants' expert, Stanley Parker, a peace officer for Tarleton State University Police and an accident reconstruction expert, concluded that Herald failed to yield the right of way from a stop sign and pulled into Hanner's path. Parker testified that the lack of visibility may have played a role in the crash and that there was no evidence that Hanner was operating his motorcycle at a speed unsafe for the conditions, although he could not answer how fast Hanner had been traveling. He concluded by saying, "[T]he sole cause of this accident was Mr. Herald failing to yield [the] right-of-way coming away from that stop sign." Parker admitted that because the fog was so bad, neither the 18-wheeler, nor the motorcycle and passenger vehicles should have been on the road.

James Lock, an accident-reconstruction expert for appellees, testified that he viewed the police accident report, went to the accident site, and viewed the actual truck and motorcycle involved in the accident. During the course of his investigation, Lock learned that Hanner was required to wear prescription glasses and that the inventory of items found at the accident site did not include prescription glasses. He testified that visual acuity is very important for drivers because everything a driver does allows the driver to maintain a safe path of travel. Lock testified that both Williams and Green arrived on the scene right as the

11

accident was occurring. He testified that "both of those folks saw it at 424 feet" because "the distance from the back of the semi truck to the store is 424 feet." He also testified that Sergeant Carr could see the gas pumps better than he could see the store, but that the gas pumps were 350 feet away from the back of the truck and the additional 75 feet to the gas store degraded his vision because of the fog. Lock testified that it was "impossible to have any scientific validity in estimating sight distance in fog unless you know things like you're at the store and you can see the back of the truck or something of that nature."

Lock conducted an acceleration analysis of the truck based on a truck with automatic transmission and three-quarter load and determined that "it took approximately 5.7 seconds for that truck to pull out there before it was struck." He also calculated that it would take 7.7 seconds for the truck to have started from the stop sign to the time that the back of the trailer would have cleared Hanner's lane. And, then it would take under two seconds more to "completely clear the westbound lane." Thus, if the motorcycle had arrived two second later, the truck would have been gone. Lock saw no evidence that Hanner braked or took any evasive maneuvers.

Lock calculated minimum speeds by using Williams's testimony that she was following the motorcycle at 55 miles per hour before the motorcycle slipped out of her line of sight. Based on Williams's testimony, Lock determined that

12

Hanner's speed was over 55 miles per hour. He concluded that Hanner's speed was not a safe speed because "you have to ride at a speed where you have enough forward visibility for you to be able to either swerve around or reduce your speed and move around whatever object . . . is in the road." Lock then calculated how many feet it would take for Hanner to brake based on perception and reaction times. He calculated that, at 55 miles per hour, it would take 121 feet to perceive and respond, and another 155 feet to brake, for a total of 276 feet. Lock testified that, assuming 428 feet of visibility at 45 miles per hour, it would take 205 feet to stop and that if the rider was perceptive, they would be able to come a stop before hitting the trailer. He also pointed out that, when a driver sees a car in an intersection, the car will delay its arrival time until the driver has a clear path of travel.

On cross-examination, Lock admitted that he did not know Hanner's optical prescription or whether Hanner was wearing his glasses on the day of the accident. He admitted that months after the accident, he did not find any glasses at the accident scene. Lock agreed that his report states that Herald's failure to yield was a proximate cause of the collision. When asked if an accident would have occurred had Herald yielded the right-of-way, Lock responded, "If he yielded the right-of-way satisfactory[ily] and other users of the road were operating in a reasonable and prudent manner, we don't have the accident." Lock agreed that the failure to yield

the right-of-way is negligence and that Herald was negligent. However, he disagreed that Herald's negligence caused the accident. He clarified that Herald's negligence was a proximate cause of the accident, but not the cause.

Lock agreed that "by entering the roadway without sufficient visibility, [Herald] exposed himself and others to needless harm" and that Herald made a mistake on the day of the accident. Lock was asked, "[s]o he made a gamble, and it cost Sean Hanner his life, right?" to which he responded, "That's not what caused Sean Hanner his life. Sean Hanner driving at 65 miles an hour—in the fog when he can't see in front of him and when he doesn't even slow down or apply the brakes for an object in front of him, that's what cost him his life." When asked, "[b]ut what you do know for certain is that Brian Herald was negligent because he failed to yield, which is the proximate cause of the collision. You know that for certain?" Lock responded, "That's one of the things that I know."

On redirect, in response to the question of whether Herald based his decision to pull out on foresight or hindsight, Lock answered, "Basing it on foresight. He looked at the situation; he's evaluating the situation; and based on his experience, he felt that he could safely do so. He rolled down the windows of his truck to listen for any oncoming traffic and he moved out." Based on foresight, Lock testified that Herald was not a proximate cause because he believed he had enough distance. Lock further testified that, "[p]roximate cause of this collision was Mr.

14

Hanner's lack of reaction to a roadway hazard." Lock stated, "It's also foreseeable that the probability of a collision could raise exponentially when you have poor visibility and you're traveling at a high speed." When asked why he thought Hanner did not brake or swerve, Lock responded, "That he was traveling too fast so his perception response time was short—too short and didn't give him time to brake or try to respond."

We conclude that legally sufficient evidence supports the jury's no-liability finding for Herald. Specifically, Herald, a truck driver with 26 years of experience, testified that, after he stopped at the stop sign on County Road 686, he looked left, looked right, and looked left again, opened his window to listen for traffic, and proceeded to make a left turn on FM 1960, after determining based on his years of driving in fog and rain that he could proceed safely. He explained, "I knew I had enough to make it; and that's when I went. I wouldn't have pulled out if I didn't have it." He also testified that "I didn't do anything wrong. I pulled out. I gave myself plenty of room in my best judgment." Herald testified that his truck's headlights were on, additional truck lights that would have been facing anyone driving from his left were also on, and the truck had reflective tape on both sides of the trailer.

Williams, who had been following Hanner for a few minutes before the accident, testified she did not think the accident could have been avoided. Britton

testified that, based on his experience and Herald's experience, "[Herald] turned left feeling he could clear the intersection and proceed safely." He also testified that, based on photographs he had seen, Herald had sufficient visibility to make the turn. Based on the foregoing evidence, appellants did not establish, as a matter of law, all vital facts in support of Herald's negligence.

In their factual sufficiency issue, appellants argue that Herald "admitted liability by telling [Agent] Cash at the scene that he pulled out across FM 1960 when he could not see in either direction and by testifying at his deposition that he caused this accident by driving blind and pulling out into the intersection." Appellants further argue that Herald did not have the right-of-way and that Herald's feeling of confidence to make a safe turn is insufficient to support the jury's no-negligence finding. Appellants point to the testimony of Agent Cash and Sergeant Carr, who both testified that it was unreasonably dangerous to pull into an intersection when the driver cannot see oncoming traffic and does not have the right-of-way.

Appellants' arguments appear to suggest that just failing to yield the right-of-way constitutes negligence as a matter of law. We disagree. A driver's failure to yield the right-of-way does not give rise to negligence as a matter of law. *See Middleton v. Palmer*, 601 S.W.2d 759, 765 (Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.); *Canales v. Womack*, No. 01-07-00222-CV, 2008 WL 2388132, at *2

16

(Tex. App.—Houston [1st Dist.] June 12, 2008, no pet.). Instead, when evidence shows that the driver exercised some care, "it becomes an issue of fact as to whether the driver's conduct was negligent." *County of Dall. v. Poston*, 104 S.W.3d 719, 723 (Tex. App.—Dallas 2003, no pet.).

Here, the jury heard conflicting evidence as to whether Herald acted negligently. Specifically, the jury heard that Herald initially testified at his deposition that he only had 100 feet of visibility. Appellants also showed that Herald had previously testified that he was "driving blind," did not have much visibility at all, and that he was gambling that no other vehicles were 101 feet away.

At the time of trial, however, Herald deviated from his deposition testimony based on learning that witnesses, including himself, could see, right after the accident, from the back of the trailer to the gas station, a distance measured at over 400 feet. Despite Herald's revised testimony, appellants' counsel continuously repeated that Herald had only 100 feet of visibility, but Herald would correct them and say he had more. Harold even testified that if headlights were on beyond the 420 feet, he could see something coming at 500 feet. The jury also heard conflicting testimony from Sergeant Carr, who thought visibility was 40 feet, but also admitted that he could see the gas station from the back of the trailer, which is a distance of over 400 feet. Lock confirmed that, based on witnesses testifying to

being able to see from the trailer to the gas station, Herald had over 400 feet of visibility. Lock also pointed out that, based on visibility of over 400 feet, Williams and Green were both able to avoid hitting the 18-wheeler.

On cross-examination, Lock admitted that the failure to yield to the right-of-way is negligence and that Herald was negligent. Lock also agreed that Herald's negligence was a proximate cause, but not the cause. Lock later answered the question of "So [Herald] made a gamble, and it cost Sean Hanner his life, right?" with "That's not what caused Sean Hanner his life. Sean Hanner driving at 65 miles an hour—in the fog when he can't see in front of him and when he doesn't even slow down or apply the brakes for an object in front of him, that's what cost him his life." On redirect, Lock stated that Herald was not a proximate cause if he was exercising foresight that tells him he believes he has enough distance.

Agent Cash testified that Herald moved into a roadway where he did not have the right-of-way and it was impossible to see the traffic. He agreed that the chance Herald took cost Hanner his life. Appellant's expert, Stanley Parker, testified that Herald failed to yield the right-of-way and pulled into Hanner's path of travel. He concluded by saying that the "sole cause of this accident was Mr. Herald failing to yield right-of-way coming away from that stop sign."

In sum, the jury heard conflicting evidence from both sides on whether Herald acted negligently. As the sole judge of the weight and credibility of the

18

evidence, the jury could reasonably conclude that, despite that an accident happened, Herald had enough visibility to make a reasonable decision to proceed into the intersection and make a left-hand turn. *See Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 655 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) ("It is the province of the jury to resolve conflicting evidence, to determine the credibility of the witnesses, and to weigh their testimony."). The jury may have determined that, under the same or similar circumstances, a truck driver is not negligent after looking both ways, opening the window to listen for traffic, and proceeding into the intersection to make a left turn after deciding he had enough space to make the turn. On this record, we cannot say that the jury's no-liability finding as to Herald was so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Waring v. Wommack*, 945 S.W.2d 889, 894–95 (Tex. App.—Austin 1997, no writ) (affirming jury's finding that defendant was not negligent in case involving collision between plaintiff bicyclist and defendant motorist attempting left turn); *Gomez v. Adame*, 940 S.W.2d 249, 252 (Tex. App.—San Antonio 1997, no writ) (affirming jury's finding that defendant was not negligent in case involving allegation that defendant failed to maintain proper lookout prior to entering roadway); *Madara v. Marshall*, 578 S.W.2d 787, 791 (Tex. Civ. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.) (affirming jury's finding that defendant was not negligent in case involving

19

collision between plaintiff motorist traveling westbound and defendant motorist attempting left turn).

We overrule appellants' first and second issues.

**Expert Testimony**

In their third issue, appellants argue that the trial court erred by not striking Lock's testimony after he alluded to a Rule 11 agreement which limited his testimony about Hanner.

During cross-examination, Lock testified that he did not know Hanner's speed, Hanner's visibility, and what Hanner could see. Appellant's counsel, Brock Ackers, then asked, "All those things determine whether or not he was being reasonable, all these things that you do not know?" Lock responded, "The reasonable back up in time a little. The reasonable is driving down the road with a lot of things that I can't talk about because you have a motion 11 or whatever where I can't bring up stuff about this guy." The following exchange then occurred in front of the jury:

> Mr. Akers:    Judge, that's the most outrageous thing that I have ever heard. Certainly in this trial, and quite awhile when the Court has ruled that certain things are absolutely positively not to be brought up and he chooses to bring up things that you have already ruled have nothing to do with this lawsuit, and he wants to bring it up as though I'm hiding something.

> Lock:    I don't want to bring it up.

Mr. Akers: This is outrageous. I object. This man ought to be stricken—his testimony ought to be stricken entirely.

Court: Do you have a response, Counselor?

Mr. Akers: This is a professional witness. He knows better than that. That's outrageous.

The following exchange then occurred at the bench:

Mr. Fahl: Your Honor, Mr. Akers has been sidebarring, cutting him off, arguing with him every which way from Sunday; and I have barely objected. The witness knows what he can't mention. Now, I apologize for his saying there's things I can't bring up; but the jury already knows there's things that can't be brought up. He didn't say anything in particular. So I would like to get to the end of this. I don't think he should be stricken.

If Mr. Akers would keep it to a question and answer without arguing, he's going to get a lot more responsive answers than he's getting when he's throwing a bunch of stuff—no, no. When you're throwing in the kind of stuff that you're throwing in which is argumentative evidence that [is] not in evidence, I mean, that's where you start getting into an arguing match.

. . .

Court: Is there anything else?

Mr. Akers: No.

Court: Did you want anything?

Mr. Akers: I would like a ruling.

Court: It's denied. Thank you.

## A.    Standard of Review

We review whether the trial court erred in declining to strike testimony or give an instruction to disregard testimony for an abuse of discretion. *Anderson Producing, Inc. v. Koch Oil Co*., 929 S.W.2d 416, 425 (Tex. 1996). We look to whether the trial court made its ruling without reference to any guiding rules or principles. *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000).

## B.    Analysis

On appeal, appellants argue that Lock's testimony gave the implication that appellant's counsel was hiding evidence of Hanner's negligence from the jury and that Lock was precluded from testifying as to his "true opinions." Appellants note that after hearing days of testimony, it only took the jury less than an hour to reach a verdict. Appellants argue that the "jury's verdict is consistent with Lock's improper suggestion that Lock had evidence of Hanner's negligence that Appellants' counsel was keeping from the jury's scrutiny" and that "Lock's statements undermined Appellants' entire case and the integrity and credibility of Appellants and their trial counsel." Appellants further argue that "Lock's 'expert opinion that Appellants were concealing evidence of Hanner's negligence from the jury was probably readily accepted" and that "the only reasonable conclusion is

that Lock's testimony probably did result in the rendition of an improper judgment."

Appellants requested that the trial court strike the entirety of Lock's testimony without explaining to the trial court or this Court why all of Lock's testimony had to be stricken based on his reference to a "motion 11." Given that appellants' counsel asked for all of Lock's testimony to be stricken, which undoubtedly contained admissible testimony, the trial court did not abuse its discretion in denying appellants request to strike the entirety of Lock's testimony. *See Williams v. Gen. Motors Corp.*, 501 S.W.2d 930, 939 (Tex. Civ. App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.) (concluding that trial court did not abuse its discretion when it denied request to strike all testimony); *Bennett v. Hood*, 238 S.W.2d 587, 590 (Tex. Civ. App.—Beaumont 1951, no writ) ("A motion to strike all the testimony of a witness when some of it is admissible and some is not will not be sustained where the motion does not point out the inadmissible testimony.").

We overrule appellants' third issue.

## Conclusion

We affirm the judgment of the trial court.


Sherry Radack
Chief Justice


Panel consists of Chief Justice Radack and Justices Massengale and Brown.